FILED
IN CLERK'S OFFICE
U S DISTRICT COURT E.D.N.Y.

★ MAR 1 9 2012 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
KEITH SALVATORE LABELLA,

                    Plaintiff,

        -against-

FEDERAL BUREAU OF INVESTIGATION,
OFFICE OF JUSTICE PROGRAMS, and UNITED
STATES DEPARTMENT OF JUSTICE,

                    Defendants.
--------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**11-CV-0023 (NGG) (LB)**

NICHOLAS G. GARAUFIS, United States District Judge.

      Plaintiff Keith Salvatore Labella brings this pro se action against Defendants Federal

Bureau of Investigation ("FBI"), Office of Justice Programs ("OJP"), and United States

Department of Justice ("DOJ"), pursuant to the Freedom of Information Act, 5 U.S.C. § 552 et

seq. ("FOIA"). Labella seeks declaratory and injunctive relief compelling the FBI to produce

certain documents related to "gang stalking" and compelling the OJP to produce certain data

related to the Supplemental Victimization Survey to the National Crime Victimization Survey

2006 ("Survey"). Defendants and Labella both move for summary judgment pursuant to Rule 56

of the Federal Rules of Civil Procedure. For the reasons set forth below, Defendants' motion for

summary judgment is GRANTED and Labella's motion for summary judgment is DENIED.

I.     **BACKGROUND**

    A.    **Labella's FOIA Request to the FBI**

On January 11, 2010, Labella submitted a FOIA request to the FBI. (Defs. Statement of

Undisputed Material Facts (Docket Entry # 18) ("SUMF") ¶ 31.[1]) Before turning to the specifics

of that request and the FBI's response, the court will briefly describe the FBI's records system.

### 1.    FBI's Records System

The FBI files information it acquires in the course of fulfilling its law enforcement

function in its Central Records System ("CRS"). (SUMF ¶¶ 1-2.) The CRS consists of a

numerical sequence of files, called "classifications," which are broken down according to subject

matter. (Id. ¶ 3.) Certain records in the CRS are maintained at FBI Headquarters, whereas

records that pertain to specific field offices of the FBI are maintained at those field offices. (Id.

¶ 4.) Although the CRS is primarily designed to serve as an investigative tool, the FBI also

searches the CRS for documents that are potentially responsive to FOIA requests. (Id. ¶ 5.)

Records in the CRS are searched using the Automated Case Support System ("ACS"), an

internal computerized subsystem of the CRS. (Id. ¶¶ 6, 8.) Because the CRS cannot

electronically query the case files for data, such as an individual's name or social security

number, the required information is duplicated, moved to the ACS, and indexed so that it can be

searched. (Id. ¶¶ 8, 10.) Because of the size of the files in the CRS, the FBI can readily search

through files only after they have been indexed; if the files were not indexed, they could serve

only an archival rather than an investigatory function.[2] (Id. ¶ 17.)

---

[1]    Labella filed a response to Defendants' SUMF. (Pl. Resp. to Defs. Undisputed Facts (Docket Entry # 24) ("RSUMF").) The court deems the facts in the SUMF admitted unless specifically controverted by Labella's counter-statement, see Local Rule 56.1(c), and so long as the court is "satisfied that the citation to the evidence in the record supports the assertion," Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004). Most of the allegations in the SUMF are taken largely verbatim from the Declarations of David M. Hardy (Docket Entry # 19) ("Hardy Decl.") and Dorothy A. Lee (Docket Entry # 20) ("Lee Decl."). The court will generally cite to the SUMF unless a fact does not appear in the SUMF or if its allegations are controverted in the RSUMF, in which case the court will cite to the declarations or other documents.

[2]    In this sense, the FBI's file system is fundamentally different from file systems like Westlaw that can be searched for any mention of a word or phrase; the FBI can search only indexed files, and then only for the terms in those files that have been included in the indices. See Labella v. FBI, No. 07-CV-2330 (NGG) (LB), 2008 WL 2001901, at *1 n.1 (E.D.N.Y. May 8, 2008) ("Labella I").

Two kinds of indices are relevant to this case. The "General Indices" to the CRS are the means by which the FBI determines what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter or individual. (Id. ¶ 18.) The General Indices consist of index cards on various subject matters that are searched either manually or through automated indices. (Id. ¶ 12.) The entries in the General Indices are arranged into two categories: (1) a "main" entry references a file contained in the CRS whose subject is that main entry; and (2) a "reference" entry, also called a "cross-reference," references a file on a different subject which merely mentions or refers to the reference entry.[3] (Id.)

The Electronic Surveillance ("ELSUR") indices are an automated system of records separate from the CRS. (Id. ¶ 23.) These indices are used to maintain information on subjects whose electronic and/or voice communications have been intercepted as a result of surveillance conducted by the FBI. (Id. ¶ 19.) The ELSUR indices are published as a separate records system because not all names contained in the ELSUR indices can be retrieved through the General Indices and CRS. (Id. ¶ 27.)

    2.    Labella's Request

By letter dated January 11, 2010, Labella submitted a FOIA request to the FBI seeking thirty-seven categories of documents relating to "the national phenomenon of gang stalking." (Id. ¶ 31.) The request defines "gang stalking" as follows:

> Gang stalking involves groups of individuals ("gang stalking groups") operating territorially and nationwide, and, in communication and collusion with each other, to violate the civil rights of, and disrupt, destabilize and finally destroy individuals who are put on a Stalking List for various reasons. The gang stalking groups use both intensive physical and electronic surveillance means to do this . . . includ[ing], but not limited to: "street theatre," in which targets of gang

---

[3]    "For example, if FBI had a file devoted to the activities of Mickey Mouse, there would be a 'Mickey Mouse' main entry in the General indices which would reference Mickey Mouse's file. If Mickey Mouse were also mentioned in FBI's file on Minnie Mouse, there might also be a 'Mickey Mouse' reference entry in the General indices, which would reference Minnie Mouse's file." Labella I, 2008 WL 2001901, at *2.

stalking are subjected in public to rudeness, loud speaking and personal references to themselves and their private activities by persons within the gang stalking conspiracy; [and] related "Flashmobbing," or the coming together of an often large group of individuals in the gang stalking conspiracy to disrupt, intimidate, harass and otherwise confuse a gang stalking victim . . . .

(Id. ¶¶ 31(3)-(4).)

Labella requested that the FBI search terms such as "targeted individual(s)" (id. ¶ 31(5)), "publicly funded victims groups" (id. ¶ 31(10)), "informants" (id. ¶ 31(15)), "agents provocateur" (id.), "community stalking" (id. ¶ 31(20)), "cause stalking" (id. ¶ 31(22)), "school shooting" (id. ¶ 31(25)), and "COINTELPRO" (id. ¶ 31(26)), all as they relate to "gang stalking."

### 3. The FBI's Search and Response

By letter dated November 10, 2010, the FBI released 298 partially redacted pages to Labella that had been previously processed for another FOIA request for information relating to gang stalking.[4] (Id. ¶¶ 33-35.) The previous request was identical to Labella's request with the exception that the thirty-sixth and thirty-seventh categories of documents in Labella's request were not included in the original request. (Id. ¶ 42.)

The search in connection with the previous request was conducted on December 9, 2009. (Id. ¶ 42.) The FBI searched the CRS using the following search terms: gang stalking, community stalking, group stalking, organized stalking, cause stalking, revenge stalking, vigilante stalking, terrorists stalking, community-based harassment, gaslighting, gang stalking groups, street theatre, flashmobbing, gang stalking methods, flashmob, noise campaigns, work

---

[4]  The pages were partially redacted pursuant to FOIA Exemptions (b)(2), (b)(6), (b)(7)(C), and (b)(7)(D). (SUMF ¶ 35.) Section 552(b)(2) of Title 5 exempts from the FOIA records "related solely to the internal personnel rules and practices of an agency[.]" Section 552(b)(6) exempts records of "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy[.]" Section 552(b)(7) exempts records or information compiled for law enforcement purposes the release of which could reasonably be expected to (C) "constitute an unwarranted invasion of personal privacy" or (D) "disclose the identity of a confidential source."

place mobbing, electronic harassment, Stalking America, stalking behavior, stalking harassment, stalking research, electronic stalking, publicly funded victim groups, gang stalking list, gang stalking members, gang stalking group members, and stalking. (Id. ¶ 43.) As a result of this search, the FBI identified two main files and one cross-reference file as potentially responsive to the request. (Id. ¶ 44.) The FBI was unable to locate one of the two main files and determined that the cross-reference file was not responsive to the December 2009 request. (Hardy Decl. ¶ 24.) Thus, only one of the main files was determined to be responsive, and documents from this file were released to Labella with redactions. (Id.) The pre-processed release consisted of documents from the National Center for Analysis of Violent Crimes' Research and Development Program regarding a U.S. Secret Service workshop on stalking behavior. (SUMF ¶¶ 46-47.)

After producing these documents to Labella, the FBI realized—and Labella admits—that none of the pre-processed documents produced to Labella is related to "the national phenomenon of gang stalking" as described in Labella's request, and that therefore Labella should not have received these documents in response to his request. (SUMF ¶ 48; RSUMF at 2; Hardy Decl. ¶ 25.) By letter dated November 12, 2010, Labella appealed the FBI's November 10, 2010, release to the DOJ's Office of Information Policy ("OIP"). (SUMF ¶ 36.)

After Labella's appealed, the FBI conducted an additional search of the CRS to determine if it had any files that would be potentially responsive to Labella's request. (Id. ¶ 49.) As part of this search, the FBI used the same search terms that it had used in connection with the previous search conducted in December 2009, and also included the following terms specified in Labella's FOIA request: terrorist stalking, gas lighting stalking, targeted individual(s), and the book title "Cause Stalking." (Id. ¶¶ 50-51.) Moreover, the FBI searched for the following terms as they related to "gang stalking": surveillance, physical surveillance, electronic surveillance, electronic

stalking, media, press, publicly funded victims group, funds, funding, targeted individual(s),
informants, agent(s) provocateur, list(s), gangstalking list(s), hierarchy, leadership, federal
jurisdiction, gang stalking members, gang stalking group members, psychological profiles,
complaints, inquiries, internet, national security, state secrets, witness protection program,
Freedom of Information Act, FOIA, mass shooting(s), school shootings, counterintelligence
program, COINTELPRO, civilian community policing group, citizen informant group, patriot
group, public private partnership, neighborhood watch group, INFRAGARD, USAonWATCH,
CITIZENCORPS, VOLUNTEERS IN POLICE, military, international law, legal liability, and
tort liability. (Id. ¶ 52.) In addition to the CRS search, the FBI conducted a search of the
ELSUR indices to identify potentially responsive files indexed to "gang stalking" and all of the
search terms listed above. (SUMF ¶ 54.) According to the FBI, no responsive records were
located as a result of the CRS and ELSUR searches. (Hardy Decl. ¶¶ 26-27.)

### B. Labella's FOIA Requests to the OJP

On March 22, 2010, Labella sent the OJP a FOIA request seeking "[a]ny and all records
including graphs, tables, charts, statistics, data compilations, notes, and, all other similar records
and similar information relating to the Supplemental Victimization Survey ('SVS') to the
National Crime Victimization Survey 2006." (SUMF ¶ 57.) By letter dated June 8, 2010, the
OJP responded to Labella with fifty-seven pages of printed material and a compact disc
containing a data set pertaining to the Survey, which consisted of over 80,000 pages of
information. (Id. ¶¶ 58-59.) The responsive data was created and is maintained using ASCII,
SAS, SPSS, and Stata Software. (Id. ¶ 60.)

On July 19, 2010, Labella submitted a second FOIA request to the OJP seeking "[a]ny
and all records including graphs, tables, charts, statistics, data compilations, notes, and, all other

similar records and similar information relating to the Supplemental Victimization Survey ('SVS') to the National Crime Victimization Survey 2006." (Id. ¶ 61.) The request further stated that "this is a request for 'aggregate data' related to the victim class and distinct subgroups of said survey *but not (i.e., excluding)* data relating to individual victims." (Id.) The request noted that Labella had been unable to open or read the data that had been previously sent by the OJP, that the software programs used to create the data "were not openable/viewable by standard software," and that, "[t]herefore, the provision of FOIA data in this format . . . [wa]s unacceptable" to Labella. (Lee Decl., Ex. C.)

The OJP forwarded Labella's second FOIA request to the Bureau of Justice Statistics ("BJS"), which informed the OJP that the disc containing the data set previously provided to Labella was also responsive to Labella's second request. (Id. ¶ 7.) By letter dated September 2, 2010, the OJP responded to Labella stating that the survey tabulations and findings were published on the BJS's website, instructing Labella how to open the data set provided to him, and informing him of his right to appeal. (Id. ¶ 8, Ex. D.) The OJP did not enclose another disc containing the data set "because the disc had been previously forwarded to Mr. Labella and he did not want another disc." (Id.)

Labella then appealed to the OIP on September 28, 2010. (Id. ¶ 9.) The OIP remanded Labella's FOIA request to the OJP on October 27, 2010. (Id. ¶ 10.) As a result of the remand, on November 19, 2010, the OJP sent Labella another disc containing the same information as previously provided. (Id. ¶ 11.) According to Dorothy Lee, the Paralegal Specialist responsible for FOIA requests at the OJP, the data on the disc cannot be converted into another electronic format—a fact that Labella now admits. (Id. ¶ 12; RSUMF at 2.)

7

**C.     Labella's Instant Lawsuit**

On January 4, 2011, Labella commenced this action, pro se, against Defendants FBI, OJP, and DOJ, pursuant to FOIA.[5]   (Compl. (Docket Entry #1).)   He seeks various forms of declaratory and injunctive relief directed toward compelling production of the documents specified in his FOIA requests.   (See id. at 18-20.)   Defendants filed an Answer on March 31, 2011.   (Docket Entry # 8.)   The parties cross-moved for summary judgment prior to conducting discovery.   (Docket Entry ## 16, 22.)

This court referred both motions to Magistrate Judge Lois Bloom for a Report and Recommendation ("R&R"), pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b).   (Order of May 20, 2011 (Docket Entry # 14).)   On February 9, 2012, Judge Bloom issued an R&R recommending that Labella's motion for summary judgment be denied and that Defendants' motion for summary judgment be granted.   (Docket Entry # 30.)   Labella filed written objections to the R&R.   (Docket Entry # 31.)   Defendants filed an opposition to Labella's objections.   (Docket Entry # 32.)

**II.     STANDARD OF REVIEW**

When a magistrate judge issues an R&R and that R&R has been served on the parties, a party has fourteen days to object to the R&R. Fed. R. Civ. P. 72(b)(2).   If the district court receives timely objections to the R&R, the court makes "a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. [The district court] may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).   However, to obtain

---

[5]      Defendants argue that only the DOJ is the proper Defendant in this action. (Defs. Reply Mem. in Supp. of Mot. for Summ. J. (Docket Entry # 27) at 1 n.1.) Because Defendants did not raise this issue until their reply, and because the court finds that summary judgment on the merits is proper as to all Defendants, the court does not reach the issue of whether the FBI and OJP are proper Defendants.

8

this de novo review of a magistrate judge's R&R, an objecting party "must point out the specific

portions of the report and recommendation to which [he] object[s]." U.S. Flour Corp. v.

Certified Bakery, Inc., No. 10-cv-2522 (JS) (WDW), 2012 WL 728227, at *2 (E.D.N.Y. Mar. 6,

2012). If a party "makes only conclusory or general objections, or simply reiterates his original

arguments, the Court reviews the Report and Recommendation only for clear error." Pall Corp.

v. Entergris, Inc., 249 F.R.D. 48, 51 (E.D.N.Y. 2008). Portions of the R&R to which a party

makes no objection are also reviewed for clear error. U.S. Flour Corp., 2012 WL 728227, at *2.

Under Federal Rule of Civil Procedure 56(a), a motion for summary judgment must be

granted if "the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." In determining whether a genuine issue of

material fact exists, "the court must draw all reasonable inferences in favor of the nonmoving

party." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149 (2000). The burden of

showing the absence of any genuine dispute as to a material fact rests on the movant. See

Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). A fact is material if its existence or

non-existence "might affect the outcome of the suit under the governing law," and an issue of

fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A grant of

summary judgment is proper "[w]hen no rational jury could find in favor of the nonmoving party

because the evidence to support its case is so slight." Gallo v. Prudential Res. Servs., L.P., 22

F.3d 1219, 1224 (2d Cir. 1994). The nonmoving party may not rest on "mere allegations or

denials" of the adverse party's pleadings to survive summary judgment, but must demonstrate by

affidavit or other admissible evidence "that there is a genuine issue of fact for trial." Anderson,

477 U.S. at 248. A "genuine issue [is not] created merely by the presentation of assertions that

9

are conclusory." Patterson v. County of Onieda, N.Y., 375 F.3d 206, 219 (2d Cir. 2004).
Likewise, "conjecture[] or speculation by the party resisting the motion will not defeat summary
judgment." Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996).

      Generally, when a plaintiff is proceeding pro se, the court "reads his papers liberally
and interpret[s] them to raise the strongest arguments that they suggest." Brownell v. Krom, 446
F.3d 305, 310 (2d Cir. 2006) (internal quotation marks omitted). However, "the rules afforded
pro se litigants are not relaxed when that litigant is also an attorney." Larsen v. JBC Legal Grp.,
P.C., 533 F. Supp. 2d 290, 295 n.2 (E.D.N.Y. 2008) (citing Leeds v. Meltz, 898 F. Supp. 146,
149 (E.D.N.Y. 1995), aff'd, 85 F.3d 51 (2d Cir. 1996)).  This court takes judicial notice of the
public records of the United States Unified Court System reflecting that Labella is an attorney
admitted to practice in New York.[6]  See http://iapps.courts.state.ny.us/attorney/AttorneySearch
(last visited Mar. 12, 2012); cf. Century 21 Real Estate, LLC v. Raritan Bay Realty, Ltd., No.
07-CV-1455 (CPS), 2008 WL 4190955, at *10 n.6 (E.D.N.Y. Sept. 3, 2008) (taking judicial
notice of attorney information on the New York State Unified Court System).  Therefore, the
court does not liberally construe Labella's Complaint and motion papers.[7]

### III.   DISCUSSION

      The Freedom of Information Act "requires federal agencies to release certain documents
in response to requests from the public." Sample v. Bureau of Prisons, 466 F.3d 1086, 1087
(D.C. Cir. 2006). The statute "was enacted to promote honest and open government and to
assure the existence of an informed citizenry to hold the governors accountable to the governed."

---

[6]     Judicial notice may be taken of public records. See Barmapov v. Barry, No. 09-CV-03390 (RRM) (RML),
2011 WL 32371, at *2 n.3 (E.D.N.Y. Jan. 5, 2011).

[7]     In Labella I, this court found that Labella was "proceeding pro se" and therefore "read his papers liberally,"
but did not address Labella's status as an attorney, which had not been raised with the court.  2008 WL 2001901, at
*7.  The court also notes that Labella did not object to Judge Bloom's conclusion that Labella is an attorney whose
papers should not be construed liberally.  (See R&R at 8.)

Grand Cent. P'ship, Inc. v. Cuomo, 166 F.3d 473, 478 (2d Cir. 1999). FOIA "strongly favors a policy of disclosure and requires the government to disclose its records unless its documents fall within one of the specific, enumerated exceptions set forth in the Act." Nat'l Council of La Raza v. DOJ, 411 F.3d 350, 355 (2d Cir. 2005). At the same time, "access to governmental information must be orderly and not so unconstrained as to disrupt the government's daily business." Grand Cent. P'ship, 166 F.3d at 478.

FOIA provides that "each agency, upon request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person." 5 U.S.C. § 552(3)(a)(3)(A). It also directs agencies to provide records "in any form or format requested by the person if the record is readily reproducible by the agency in that form or format." Id. § 552(a)(3)(B). There are nine categories of records that are exempted from FOIA by 5 U.S.C. § 552(b), and three categories that are excluded from FOIA by 5 U.S.C. § 552(c).

FOIA gives the district courts "jurisdiction to enjoin [an] agency from withholding agency records and to order production of any agency records improperly withheld from the complainant." Id. § 552(a)(4)(B). The court reviews a decision to withhold records de novo. Id. "Summary judgment is the preferred procedural vehicle for resolving FOIA disputes." Adamowicz v. IRS, 552 F. Supp. 2d 355, 361 (S.D.N.Y. 2008); see also Jones-Edwards v. Appeal Bd. of the Nat'l Sec. Agency Cent. Sec. Agency, 352 F. Supp. 2d 420, 423 (S.D.NY. 2005). At the summary judgment stage, the burden is on the agency to show that it complied with its obligations under FOIA. See 5 U.S.C. § 552(a)(4)(B); Carney v. DOJ, 19 F.3d 807, 812 (2d Cir. 1994); Ruotolo v. DOJ, 53 F.3d 4, 9 (2d Cir. 1995).

11

The court will now discuss, in turn, whether summary judgment is proper with respect to Labella's FOIA request to the FBI and with respect to Labella's FOIA request to the OJP.

**A.   Labella's FOIA Claim Regarding FBI Records**

Labella asserts that the FBI improperly withheld the documents he requested relating to "gang stalking." (Compl. ¶¶ 18, 20.) Defendants argue that they are entitled to summary judgment because the FBI conducted adequate and reasonable searches in response to Labella's FOIA request. (Defs. Mem. of Law in Supp. of Defs. Mot. for Summ. J. (Docket Entry # 21) ("Def. MSJ Mem.") at 5-8.) The court agrees with Defendants.

        1.    Standard for an Adequate Search

"When the plaintiff in a FOIA case alleges that the agency in question has improperly withheld documents through its failure to locate them, the agency's burden is to establish that it conducted an adequate search that failed to produce the requested records." Garcia v. DOJ, 181 F. Supp. 2d 356, 366 (S.D.N.Y. 2002) (internal quotation marks omitted); see also Carney, 19 F.3d at 812. A search is adequate if it is "reasonably calculated to discover the requested documents." Grand Cent. P'Ship, 166 F.3d at 489. An agency need not show that its search was "perfect" or that it "actually uncovered every document extant"; it must show only that its search was reasonable. Id.; see also Garcia 181 F. Supp. 2d at 368 ("The agency is not expected to take extraordinary measures to find the requested records, but only to conduct a search reasonably designed to identify and locate responsive documents." (internal quotation marks omitted)).

"Affidavits or declarations supplying facts indicating that the agency has conducted a thorough search . . . are sufficient to sustain the agency's burden," Carney, 19 F.3d at 812, so long as these affidavits "describe in reasonable detail the scope and method by which the search was conducted," Labella v. FBI, No. 07-CV-2330 (NGG) (LB), 2008 WL 2001901, at *6

(E.D.N.Y. May 8, 2008) ("Labella I").  "Affidavits submitted by an agency are accorded a presumption of good faith; accordingly, discovery relating to the agency's search and the exemptions it claims for withholding records generally is unnecessary if the agency's submissions are adequate on their face."  Carney, 19 F.3d at 812 (internal quotation marks and citation omitted).

Once the agency has satisfied its burden, the plaintiff may avoid summary judgment and justify discovery only if he "make[s] a showing of bad faith on the part of the agency sufficient to impugn the agency's affidavits or declarations, or provide[s] some tangible evidence that an exemption claimed by the agency should not apply or summary judgment is otherwise inappropriate."  Id.  "Agency affidavits cannot be rebutted by purely speculative claims about the existence and discoverability of other documents."  Id. at 813 (internal quotation marks and alteration omitted); see also Garcia, 181 F. Supp. 2d at 366 ("Speculation that other documents exist, without more, 'does not undermine the finding that the agency conducted a reasonable search.'" (quoting SafeCard Servs. Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991)).

2.    The FBI's Search Was Adequate

Labella alleges that the FBI "failed to perform an adequate search" for records related to gang stalking and "continue[s] to improperly withhold agency records from" Labella.[8]  (Compl. ¶ 20; see also Pl. Obj.)  The court disagrees; the FBI has met its burden to show by affidavit that

---

[8]    Labella also briefly "touch[es] upon the possibility of a [5 U.S.C. § 552(b)(7)(C) FOIA exemption] being raised in this case," and argues that "[i]f defendant FBI is claiming special circumstances relating to an ongoing investigation entitling it to exclusion pursuant to subsection [(b)(7)(C)], this Court must receive a secret Declaration detailing the FBI's purported right to exclusion" and must rule on the propriety of the FBI's invocation of the exemption.  (Pl. Mem. of Law in Opp'n to Defs. Mot. for Summ. J. and in Supp. of Pl. Cross-Mot. (Docket Entry # 26) ("Pl. MSJ Mem.") at 10.)  Judge Bloom recommended rejecting Labella's argument because:  (1) both parties agree that the pre-processed records released to Labella that were redacted pursuant to Exemption (b)(7)(C) were not responsive to Labella's FOIA request, so the FBI's claim to an exemption with respect to those records is irrelevant to this case; and (2) Labella's "complaint does not present a claim against defendant FBI for withholding information pursuant to a FOIA exemption."  (R&R at 13 n.11.)  Labella does not object to this portion of the R&R, so the court reviews it for clear error and finds none.  See U.S. Flour Corp., 2012 WL 728227, at *2.

it conducted a search "reasonably calculated to discover the requested documents," Grand Cent.
P'Ship, 166 F.3d at 489, and Labella has not made a "showing of bad faith on the part of the
[FBI] sufficient to impugn the [FBI]'s affidavit[]," Carney, 19 F.3d at 812.

a.    <em>FBI's Burden to Show an Adequate Search</em>

With respect to Labella's FOIA claim against the FBI, Defendants submitted the
declaration of David M. Hardy, the Section Chief of the Record/Information Dissemination
Section within the Records Management Division of the FBI.  As discussed in more detail above
(see Part I.A.3, supra), Hardy represents that, after the FBI concluded that the pre-processed
documents it released to Labella were not responsive to his request, it conducted an additional
search of the CRS and the ELSUR indices using the terms specified in Labella's request as well
as dozens of additional terms related to gang stalking.  (Hardy Decl. ¶¶ 25-27.)  The Hardy
Declaration states that "the methods used to conduct such searches, and the scope of such
searches, were fully consistent with FBI practices and procedures" (id. ¶ 28), which are
described in detail in the Hardy Declaration (see id. ¶¶ 14-23) and summarized above (see Part
I.A.1, supra).  According to Hardy, these searches yielded no responsive records.  (Id. ¶¶ 26-27.)
Hardy's statements are presumed to have been made in good faith.  See Carney, 19 F.3d at 812.

Although the FBI's searches failed to recover any responsive documents, the Hardy
Declaration establishes that the FBI's search was "reasonably calculated to discover the
requested documents." Grand Cent. P'Ship, 166 F.3d at 489.  Indeed, in Labella I this court
found that a similar search conducted by the FBI was adequate to sustain its initial burden.  See
2008 WL 2001901, at *8 (finding that the FBI's search was adequate where it "searched through
the main and reference entries of the General indices and the electronic surveillance indices" and
where its affidavit "described which search terms [it] used, including various permutations of"

14

the requested search terms).  As in Labella I, "[b]ecause Defendants have provided affidavits that show in sufficient detail that their searches were reasonable and adequate, Defendants have met their burden."  Id.

        b.    *Labella's Burden to Rebut the FBI's Showing*

Because the agency has satisfied its burden to show a reasonable search, Labella may avoid summary judgment only if he "make[s] a showing of bad faith on the part of the agency sufficient to impugn the agency's affidavits or declarations, or provide[s] some tangible evidence that an exemption claimed by the agency should not apply or summary judgment is otherwise inappropriate."  Carney, 19 F.3d at 812 (internal quotation marks and citation omitted).  Crucially, Labella does not dispute that the FBI searched its CRS and ELSUR indices using virtually identical search terms to the ones he himself provided in his FOIA request, plus numerous additional terms.[9]  (See SUMF ¶¶ 31, 43, 50-52, 54; RSUMF.)  But he argues that the affidavit he submitted and the documents attached to it "contain[] evidence of strong inferences casting significant doubt as to whether defendant FBI could have come to a 'no records' determination after a 'reasonable search' for records relating to the national phenomenon of gang stalking."  (Pl. MSJ Mem. at 7; see also Pl. Aff. (Docket Entry # 25).)

The documents attached to Labella's affidavit can be divided into four main categories.  The court finds that none of these documents seriously undermines the FBI's affidavit.

---

[9]      The only difference Labella points to between the search terms used by the FBI and the search terms he provided in his FOIA request is that Labella requested the search term "flash mob" whereas the FBI used the term "flashmob"—i.e., without a space between "flash" and "mob."  (Pl. Reply Mem. of Law in Opp'n To Defs. Mot. for Summ. J. and in Supp. of Pl. Cross-Mot. (Docket Entry # 28) ("Pl. MSJ Reply") at 2-3, 7.)  This slight distinction— even if made in error—comes far from demonstrating bad faith or a lack of thoroughness on the part of the FBI.  See Grand Cent. P'Ship, 166 F.3d at 489 (agency need not show that search was "perfect" or that it "actually uncovered every document extant," but only that search was reasonable).  The same is true of the FBI's failure to state exactly when it conducted its second search—a detail that the court does not consider to be important to determining the reasonableness of the FBI's search—and its mistaken statement that the date of the release was November 10, 2011, when it was in fact November 10, 2010—a mere typographical error.  (See Pl. MSJ Reply at 7.)

                 i.       Documents Indicating the Breadth of Gang Stalking

First, Labella submits a number of documents indicating the breadth of the "national phenomenon of gang stalking." (See Pl. Aff., Ex. A at 5, 12 (BJS Special Report released by OJP entitled "Stalking Victimization in the United States," showing that over 25% of stalking victims reported either cyberstalking or electronic monitoring and that over 13% of stalking victims reported being stalked by three or more offenders), Ex. B (OJP response to Labella's FOIA request stating that 185,050 Americans are being stalked by three or more offenders), Ex. I (news story in which police lieutenant states that "gang stalking is nothing new" and that "police are becoming more aware of gang stalking because of cyber bulling"), Ex. J (response to request Labella made of the Santa Cruz Police Department for records relating to gang stalking, which includes an internal police memo stating that gang stalking "has implications to workplace violence"), Ex. K (news story about gang stalking in San Antonio), Ex. L (results of internet poll entitled "how long have you been a victim of gang stalking?"), Ex. M (photograph of billboard in Los Angeles advertising "Organized Stalking & Remote Electronic Assaults"), Ex. N (news story about rise of flash mob robberies and flashmobbing), Ex. O (same); Pl. MSJ Mem. at 5, 8-9; Pl. Obj. at 1-2.)

These documents are neither FBI records nor contain any mention of the FBI, so presumably Labella submits them to suggest that since gang stalking is so pervasive and so well-known to several government agencies, the FBI *must* have documents responsive to his FOIA request. (See, e.g., Pl. Aff. ¶ 20 ("[G]ang stalking is being reported in every state and country, and, nearly every city and town in the U.S."); Pl. MSJ Reply at 7 (arguing that "[t]he FBI is the nation's leading law enforcement agency and should be presumed to know criminal trends known to other law enforcement agencies, investigators and others"); id. at 8 ("[T]he fact

16

that those controlling Washington policy are interested in internet conspiracy theories makes the FBI's 'no records' claim on the subject suspect given that gang stalking is ablaze on the internet (and has been for years).").)

Labella's argument is unavailing. Even assuming that information about gang stalking is widely disseminated by other persons and law enforcement agencies, that does not demonstrate that the FBI possesses such information in its records.[10] Indeed, Labella's suggestion that, because it is the nation's leading law enforcement agency, the "FBI should be charged with *constructive* ('legal') knowledge of gang stalking and *presumed* to have records thereof" (Pl. MSJ Mem. at 12 (emphases added)), shows only that Labella has no evidence at all that the FBI actually possesses records responsive to his request, let alone that the FBI failed to conduct a good-faith and reasonable search of its records. Labella's proposed "presumption" turns the law on its head; it is the *FBI* that is entitled to a presumption of good faith with respect to its affidavit, see Carney, 19 F.3d at 812, and Labella cannot rebut that presumption by speculating that the FBI simply must have the records he requests because of its stature and resources, see Grand Cent. P'Ship, 166 F.3d at 490 (plaintiff's "speculation that there must be more documents which [defendant] has deliberately or negligently failed to produce" did not sustain plaintiff's burden of demonstrating bad faith); Jones-Edwards, 352 F. Supp. 2d at 422 ("Plaintiff's belief . . . that the NSA did not make a reasonable search—because if it had it would have found something—is not enough to withstand this motion for summary judgment."); Garcia, 181 F. Supp. 2d at 369 (allegation "that records were 'surely created' by the FBI regarding" plaintiff's FOIA request without "tangible evidence that such documents actually exist and are being

---

[10]    The court also notes that the FBI is not obligated to conduct a search of records outside of its possession. See Kissinger v. Reporters Comm. for Freedom of the Press, 445 U.S. 136, 152 (1980) ("[P]ossession or control is a prerequisite to FOIA disclosure duties."); Grand Cent. P'Ship, 166 F.3d at 479.

withheld in bad faith . . . rest[ed] on speculation" and could not "rebut[] the good faith presumption that attaches to the Government's search" (internal quotation marks omitted)).

ii.    Press Releases Regarding the FBI

Labella submits two press releases supposedly showing the FBI's involvement in and access to data on stalking. First, he submits a press release by the BJS stating that the BJS and FBI recently launched an online data tool to make it easier to research crime data. (See Pl. Aff., Ex. C; Pl. MSJ. Mem. at 5.) Labella does not explain how either the press release or the data tool—a publicly-accessible version of the Uniform Crime Reports—relates to gang stalking other than by vaguely asserting that the BJS is the "co-author of the Stalking Report" attached as Exhibit A to his affidavit. (Pl. MSJ Mem. at 5.) This press release is of no help to his case.

Second, Labella attaches an American Bar Association press release stating that "roving teens say the FBI will help" the Philadelphia police fight flashmobbing by "monitoring social media networks used to recruit participants." (Pl. Aff., Ex. P; see also Pl. MSJ Mem. at 9; Pl. Obj. at 2.) Labella emphasizes that the press release "is dated March 25, 2010 and *predates* the FBI's second search in this case by at least 8 months," and argues that the FBI's failure to find this document shows either that its search was "inadequate to locate the files an ordinary trier of fact would expect it to maintain regarding its own law enforcement activities" or that "the FBI is being disingenuous." (Pl. Obj. at 2-3.)

The court disagrees. The press release reports only that "*roving teens say* the FBI *will* help" the police fight flash mobs. (Pl. Aff., Ex. P (emphases added).) There is no indication from the press release that the "roving teens" were correct, that the FBI ever provided the help discussed—either before Labella's FOIA request or otherwise—or that the FBI documented its involvement in these activities. Thus, this document also does not undermine the FBI's affidavit.

18

iii.     Gunderson Affidavit

Labella submits an affidavit of Ted L. Gunderson, a licensed private investigator in

California who previously served for nearly three decades as head of three FBI field offices and

as Assistant Section Chief at FBI Headquarters. (Pl. Aff., Ex. D; Pl. MSJ Mem. at 6.)

Gunderson's affidavit states that "it is [his] professional opinion that the F.B.I. is involved in and

has investigative files on the subject of gang stalking, related gang stalking methods, and gang

stalking groups in the F.B.I.'s vast intelligence files, that are responsive to Mr. Labella's F.O.I.A.

Complaint." (Pl. Aff., Ex. D. ¶ 9.) Gunderson asserts that "[t]he F.B.I. may be using a unique

codename and nomenclature for the gang stalking phenomenon in its records," but that does not

change his opinion that it has files on gang stalking. (Id.) The affidavit also states that "[t]he

F.B.I. and other intelligence agencies are administering and covering up the rogue, covert,

government criminal enterprise of gang stalking." (Id.)

Like Labella, Gunderson—whose employment with the FBI ended in 1979—offers little

more than speculation; he provides no tangible evidence supporting his theory that the FBI is

involved in or has access to records on gang stalking, let alone calling into question the

reasonableness of the FBI's search for records on the subject. Gunderson vaguely asserts that

"[t]he gang stalking phenomenon appears in the records of both the F.B.I. and the N.S.A. in their

records pertaining to the Echelon Program, Carnivore System, and Tempest Systems," and "in

their records pertaining to information collected by Narus systems." (Id.) But he provides no

explanation either of the basis for his assertion or of the nature of the information on gang

stalking that supposedly appears in those records, without which there is no way for the court to

determine whether the records (1) exist and (2) should reasonably have been discovered in the

FBI's search. And although Gunderson asserts that he has "files on numerous cases of active,

19

programmatic, illegal government harassment currently being conducted against thousands of Americans," Gunderson does explain the content of these files, does not explain how they are related to the FBI or to gang stalking specifically, and does not assert that the FBI has the same files that he does. (Id.) Indeed, Gunderson alleges that the FBI's involvement in gang stalking results from the FBI being "secretly infiltrated" by a "sophisticated network of rogue operatives"—whereas "most individuals working in the F.B.I. . . . are honest, law-abiding public servants." (Id., Ex. D ¶ 6.) If anything, this assertion undermines his suggestion that the FBI employees administering FOIA requests would have access to documents on gang stalking.

Gunderson also assumes that the Federal Government must be involved in gang stalking because "[t]his conspiracy is far too active to be controlled or operated by private enterprise whose goals are achieving financial gain." (Id., Ex. D ¶ 4.) Much of his affidavit opines on the *capacity* of the Federal Government to conduct a widespread gang stalking campaign. (See, e.g., id., Ex. D ¶ 5 (discussing the existence of "a Central Command, located within the U.S., . . . whose administrators *can* instantly initiate surveillance, phone taps and harassment against any individual in the country," and which has "the technology, financing and manpower to dispense illegal surveillance and harassment against anyone at any time" (emphasis added)).) Of course, the fact that the Federal Government *can* conduct a widespread gang-stalking campaign does not mean that it *does*, that the FBI is involved in the campaign, or that the FBI has records on the campaign that should have been produced in response to Labella's request. Like Labella's suggestion that the FBI "should be presumed" to know about gang stalking because of its scope (Pl. MSJ Reply at 7), Gunderson's speculative statements cannot rebut the presumption of good faith afforded to the FBI's affidavit. See Grand Cent. P'Ship, 166 F.3d at 490; Jones-Edwards, 352 F. Supp. 2d at 422; Garcia, 181 F. Supp. 2d at 369.

iv.    Documents Showing FBI's FOIA Practices

Finally, Labella submits documents supposedly showing misbehavior by the FBI with

respect to FOIA generally.  (See Pl. Aff., Ex. E (news article stating that FBI withheld records

from court pursuant to FOIA exclusion without explaining basis for exclusion by affidavit), Ex.

F (news article reporting that FBI used secret drives to isolate information and hide it from FOIA

plaintiffs); Pl. MSJ Mem. at 6-7.)  But even if these articles are fully credited, two isolated

incidents of the FBI's non-compliance with FOIA do not demonstrate that the FBI failed to

conduct a reasonable search or acted in bad faith in this specific instance.

*   *   *   *   *

In sum, because the FBI has satisfied its burden to show by affidavit that it conducted a

search "reasonably calculated to discover the requested documents," Grand Cent. P'Ship, 166

F.3d at 489, and because Labella has not made a "showing of bad faith on the part of the [FBI]

sufficient to impugn the [FBI]'s affidavit[]," summary judgment must be granted in favor of

Defendants on Labella's FOIA claim regarding FBI records, Carney, 19 F.3d at 812.

**B.    Labella's FOIA Claim Regarding OJP Records**

Labella argues that the OJP failed to adequately respond to his July 19, 2010, FOIA

request because it did not produce records relating to the Survey in an electronic format that

Labella could access.  (Pl. MSJ Mem. at 1-2, 12-16.)  While "conced[ing] to OJP's sworn

assertion that it could not reproduce the records in another 'electronic format,'" Labella argues

that the OJP could have "narrowed down the records on the released disc and sent [him] a

sub-set in print form."  (Id. at 2; see also id. at 14.)

Judge Bloom recommended that Defendants' summary judgment motion be granted on

Labella's FOIA claim regarding OJP records and that Labella's cross-motion be denied.  (R&R

21

at 13-17.) Because Labella has not objected to this portion of the R&R, the court reviews it for clear error.[11] See U.S. Flour Corp., 2012 WL 728227, at *2. The court has reviewed the record and Judge Bloom's well-reasoned R&R for clear error and found none.[12] Therefore, the court adopts this portion of the R&R, and notes that the parties have waived further judicial review of this issue by failing to object. See Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd, & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010) ("[A] party waives appellate review of a decision in a magistrate judge's Report and Recommendation if the party fails to file timely objections designating the particular issue.").

---

[11]     Labella's written objections to the R&R do contain some general statements that could be interpreted to apply to the R&R as a whole rather than just the portion of the R&R relating to Labella's FOIA request to the FBI. (See, e.g., Pl. Obj. at 1 (arguing that the R&R "is wholly incomplete, inadequate and altogether lacking in thoroughness as to afford anything resembling a meaningful review"); id. at 5 ("Plaintiff pleads that this Article Three Court exercise its authority and obligation, and make a thorough de novo determination in this matter. Plaintiff pleads that this Court find that the R&R in this case is based on a thoroughly incomplete analysis of plaintiff's case, and give it de minimus, if any, consideration.").) To the extent that Labella's frivolous—and disrespectful—attacks on the R&R are directed toward the portion of the R&R addressing his FOIA requests to the OJP, these objections do not change the court's standard of review. See U.S. Flour Corp., 2012 WL 728227, at *2; Pall, 249 F.R.D. at 51 (if party "makes only conclusory or general objections . . . , the Court reviews the Report and Recommendation only for clear error").

[12]     The court does wish to clarify one point: if Labella's FOIA request to the OJP had explicitly requested production of the data sent to him by the OJP in printed form, this might be a different case. FOIA requires an agency to "provide the record in any form or format requested by the person if the record is readily reproducible by the agency in that form or format." 5 U.S.C. § 552(a)(3)(B) (emphasis added). Although it is true that the FBI represents—and Labella concedes—that the disc sent to Labella by the OJP could not be converted into a different electronic format (see Lee Decl. ¶ 12; RSUMF at 2), the court expects that printed versions of the disc would have been "readily reproducible by the agency," and would therefore have been required to be released to Labella upon his request unless such a release would have been unreasonably burdensome, see Ruotolo, 53 F.3d at 9.
        Here, however, the court finds no clear error in Judge Bloom's determination that "[n]either [Labella's] FOIA requests to defendant OJP, nor [Labella's] complaint, include any demand for information from the Survey in printed form," and that Labella did not seek production of data on the Survey in printed form until the instant cross-motions were filed. (R&R at 15 n.13.) To the contrary, the request makes clear that Labella was not requesting a printed version of the data sent previously but rather "aggregate data." (Lee Decl., Ex. C ("[T]his is a request for 'aggregate data' related to the victim class and distinct subgroups of said survey but not (i.e. excluding) data relating to individual victims.").) As Judge Bloom correctly noted (see R&R at 17), FOIA did not obligate the OJP to provide Labella with "aggregate data." See Amnesty Int'l USA v. CIA, 728 F. Supp. 2d 479, 499 (S.D.N.Y. 2010) ("FOIA does not require an agency to create a document in response to a request.").

## IV.    CONCLUSION

For the above reasons, Defendants' motion for summary judgment is GRANTED

pursuant to Federal Rule of Civil Procedure 56; Labella's motion for summary judgment is

DENIED.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
      March _16_, 2012

NICHOLAS G. GARAUFIS
United States District Judge

23